Barbour, Ch. J.
This action was brought to recover a part of one quarter’s rent of a building, of which the defendants were the lessees, under a lease containing the following provision:—14 In case the premises leased shall be partially damaged by fire, but not rendered wholly untenantable, the same shall be repaired with all proper speed at the expense of the said parties of the first part; but in case the damage shall be so extensive as to render the premises untenantable, the rent shall be proportionably paid up to the time of such destruction, and shall from thenceforth cease until such time as the same shall have been put in good repair.” The answer alleged that a fire occurred upon the premises within the quarter in question which rendered the building untenantable, and claimed a rebatement from the rent for the time occupied in making the repairs. The only question for consideration here is, whether the evidence given: upon the trial was sufficient to jus *533 tify the finding of the jury that the damage caused by the fire was so extensive as to render the premises untenantable.
The witnesses testified to the following facts :—The demised premises consisted of a four-story building, with a basement an.d sub-cellar; the first story, basement and sub-cellar were underlet by the defendant to Hotchkiss Brothers, dealers in Saratoga water; the second, third and fourth stories to Howell & Co., dealers in threads ; and the third and fourth stories were, by the latter firm, underlet to Stein, a hoop skirt manufacturer. The fire broke out in the third story, and burned á hole through the floor of that story, and the ceiling of the second story, about five feet in diameter, but extended little, if any, farther. The firemen, however, poured in a flood of water, and that, together with the fire itself, injured the building to such an extent that the cost of repairing it was seven hundred dollars. The mechanic who made the repairs said :— “Various parts of the building were damaged, .some more than others; the principal part of the damage was on the second floor, in the rear; there were about five feet of the ceiling and beams between that and the third floor burned through ; we had to plaster it pretty nearly all over, the ceiling and side walls, and to put in about five feet of new floor, two new beams, and three rear windows. After cutting away what was charred and injured by the fire, it left a clear opening of about five feet; there was no other part of the building burned; the other injury was by the water and smoke ; we had to kalsomine the walls and put on new ceiling and side walls on the third floor, and kalsomine the ceiling on the fourth floor. The roof was not interfered with at all, nor the fourth floor, except by smoke; on the third floor we put on an entire new ceiling, and put in three windows ; we kalsomined the first floor.” Another witness (Mr. Howell, the occupant of the *534 second story,) testified that on the day succeeding the fire “the third floor was in a fearful condition, covered with smoke, water and rubbish, and entirely untenantable ; that part of the building was unfit for any one to stay in. I went to the floor below . . because I could not go into our loft. The rear part of the office was sopping wet, . . the walls were entirely wet; any one could see the water running down.” He also stated that the greater portion of his stock of thread, worth- ninety thousand dollars, was injured by the water, fire and debris, and he removed it from the premises.
Mr. Hollinshead testified : “Irepresent four insurance companies, at Ho. 6 Pine street. I have been a,n insurance agent about nineteen years in this city; I went to the premises in question the next morning after the fire. Howell & Colby had their goods insured in three of my companies, five thousand dollars in each. I got there in the morning about 9 or 10 o’clock, and found that a fire had occurred in what we term the second loft or third floor; there must have been a large quantity of water from what we saw running all over the premises ; the lower floor was occupied by persons selling soda water. The condition of the premises on the second floor was such that we immediately requested Howell & Colby to remove their goods, because the dampness and filthy condition of the place made every hour so much loss to us, being destructive to the goods. I did not go further up than the loft above; that was very much destroyed. I think there was no salvage of the goods there at all. I should judge the plastering had to come off from the dampness. The condition of the second floor was such that I should not have occupied it for any purpose at all; the walls were wet; the water thrown in above came down on the walls each side, and caused a great humidity of the atmosphere. They had to keep a fire *535 going all the time, to make it bearable. On the first floor the water came down, and everything was apparently wet all around. ” Mr. Dawson, the occupant of the first floor, basement, and sub-cellar, said : On our floor, the, ceiling was replastered overhead, the office repapered, and the plastering in the office repaired. I remained there until the premises were put in order. I was in a very uncomfortable condition while there, after the fire; the floor was wet, and the walls wet for a long time afterwards. Our goods are not of a perishable nature by water or dampness ; they are very bulky and heavy to move. We had a large quantity of stock stored in the sub-cellar and basement, and we preferred to remain there, rather than to get another location. We preferred some personal discomfort rather than change places, considering the loss of business consequent on removal; it was known by our customers that that was our place of business.” Other evidence of a similar character was also given. It appeared, too, that the occupant of the first story, basement, and cellar, paid rent to the defendants for the entire quarter, but Howell & Co., did not, and there is no evidence whether the occupant of the third and fourth stories either paid rent or removed from the premises.
The question whether the sub-tenants, or any of them remained upon the premises and paid rent, or removed therefrom, is wholly unimportant, except in so far as the actual fact in that regard may tend to corroborate or discredit the statements and opinions of the witnesses touching the condition.of the building ; and that, of course, was a matter for the jury to consider and determine.
There can be. no doubt that the condition in the lease which exonerated the lessees from the payment of rent in case the building should become untenantable by reason of a fire, applied to the whole building, and *536 the use of it, as an entirety ; for it was the whole building, as an entirety, that was the subject matter of the lease. If, then, the evidence presented to the jury,' as above, was sufficient to satisfy them, as reasonable men, that the building, considered as an entirety, was so injured by the fire as to have become for the time untenantable,—or, according to the very apt definition of Dr. Webster, if it was “ not fit for an occupant; not in suitable repair or condition for a. tenant,” the verdict cannot be disturbed.
The testimony shows, not that one or two rooms only were injured, or that- the damage to the building in so far as its use by a tenant was concerned, was so small as to bring it within the maxim de minimis non curat lex, but that all the principal stories, except the fourth, were injured by the fire, water, or debris, to such an extent as to be, for some time at least, in an unfit condition for occupáney and the proper transaction of business by a tenant. . The verdict, therefore, is fully sustained by the evidence; and, of course,, the judgment and order appealed from must be affirmed,, with costs.